BROWN, Assignee, etc., v. THE JEFFERSON COUNTY NAT. BANK.

*(Circuit Court, N. D. New York.   June 21, 1881.)*

1. BANKRUPTCY—ILLEGAL PREFERENCES.

Proof of the existence of a desire on the part of the debtor that a particular creditor may succeed by the usual proceedings in a suit in obtaining a preference over other creditors, so that such preference may be maintained even as against proceedings in bankruptcy which may be subsequently commenced, is insufficient to establish that the debtor procured or suffered his property to be taken on legal process with intent to prefer such creditor.

2. SAME—SAME—AGENT—NOTICE.

A national bank, having reasonable cause for believing that a party whose paper it had discounted was insolvent, instructed a firm of attorneys, who were its debtors' attorneys, though of this it was not aware, to proceed to collect its debt. By the collusion of the debtors they were enabled in due course of judicial proceedings to obtain judgments and levy executions before the institution of proceedings in involuntary bankruptcy by the other creditors. *Held,* that the knowledge of the attorneys, though unknown to their principals they had peculiar facilities for obtaining information, so long as it was obtained about their employment was the knowledge of the bank, since disclosure would involve no breach of professional confidence; and that the judgments and levies were void as against an assignee in bankruptcy.

*G. W. Adams,* for plaintiff.

*Levi H. Brown,* for defendant.

BLATCHFORD, C. J.    The district judge, in his decision in this case, says that "this is evidently a case where the bankrupts, in contemplation of insolvency, desired to secure their indorsers and the defendant, and, through the advice of their attorneys, concluded to do it by means of judgments and executions," and that "the attorneys employed to bring actions and obtain judgments were the bankrupts' attorneys."    The mere existence of a desire on the part of a debtor, however strong such desire, that a particular creditor may succeed by suit, judgment, execution, and levy in obtaining a preference over other creditors, so that such preference may be maintained, even as against proceedings in bankruptcy which may be subsequently commenced, is not sufficient to establish that the debtor procured or suffered his property to be taken on legal process, with intent to prefer such creditor, if the proceedings of the creditor were the usual proceedings in a suit, unaided by any act of the debtor either by facilitating the proceedings as to time or method, or by obstructing other creditors who otherwise would obtain priority. This doctrine was firmly established by *Wilson* v. *City Bank,* 17 Wall. 473, and other cases which succeeded it.    The absence of the inhib-

ited intent on the part of the debtor leaves the creditor's levy to stand, even though the creditor had reasonable cause to believe, when the property was taken, that the debtor was insolvent, and then knew that a preference was being secured as against other creditors. There is nothing in *Wilson* v. *City Bank*, or in any other case, which sanctions the view that the mere existence of a desire on the part of the debtor that the creditor may secure and maintain the preference, although concurrent with the not interposing any hindrance to the suit and the levy, is a procuring or suffering of the levy with the forbidden intent. In that case the debtors were insolvent when the suit was brought, and the creditor then had reasonable cause to believe they were insolvent, and knew that they had committed an act of bankruptcy.

The case of *Wilson* v. *City Bank* arose under the act of March 2, 1867, (14 St. at Large, 534, 536.) The thirty-ninth section used the words "procure or suffer his property to be taken on legal process, with intent to give a preference," etc. The thirty-fifth section used the words, "with a view to give a preference to any creditor  *  *  * procures any part of his property to be  *  *  * seized on execution." The court said that as both of these sections had the common purpose of making such preferences void, and both of them made the illegality to depend on the intent with which the act was done by the bankrupt and the knowledge had by the other party of the bankrupt's insolvent condition, and as both of them described substantially the same acts of payment, transfer, or seizure of property so declared void, it was very strongly to be inferred that the act of *suffering* the debtor's property to be taken on legal process in section 39 is precisely the same as *procuring* it to be attached or seized on execution in section 35. The court also noted the fact that the word "procure" and the word "suffer" were both of them used in section 39. In the Revised Statutes, section 5021 contained a re-enactment of the above part of section 39 of the act of 1867, using the words "procures or suffers." By section 12 of the act of June 22, 1874, said section 39, and consequently said section 5021, was amended by striking out the words "or suffer," so as to read "procure his property to be taken on legal process, with intent to give a preference," etc. In the Revised Statutes, section 5128 contained a re-enactment of the above part of section 35 of the act of 1867, but altered the word "procure" to the words "procures or suffers." The amendatory act of June 22, 1874, did not amend section 35 of the act of 1867 as to the above language. The Revised Statutes were enacted June 22, 1874. Thus, apparently

on one and the same day, congress altered section 39 by striking out "suffer," and altered section 35 by inserting "suffer." It is provided by section 5601 of the Revised Statutes that the enactment of the Revision is not to affect any act of congress passed since December 1, 1873, and that all acts passed since that date are to have full effect as if passed after the enactment of said Revision, and that, so far as such acts vary from or conflict with any provision contained in said Revision, they are to have effect as subsequent statutes, and as repealing any portion of the Revision inconsistent therewith.

In view of this last enactment, and of the construction thus given by the supreme court to section 35 and section 39, and in consonance with the general rules for the construction of statutes, and the special rules applicable to the construction of said Revision, the provisions of the amendatory bankruptcy act of June 22, 1874, so far as they, in amendment of section 39 of the act of 1867, vary from or conflict with any provision contained in section 35 of the act of 1867, and in section 5128 of the Revised Statutes, enacted June 22, 1874, must be held to have effect as provisions enacted subsequently to the Revised Statutes, and as repealing any provision of section 35 of the act of 1867 and of section 5128 of the Revised Statutes that is inconsistent with such provisions of such amendatory bankruptcy act. In this view, the word "suffer," being distinctly and affirmatively eliminated by section 12 of said amendatory bankruptcy act from section 39 of the act of 1874, and from section 5021 of the Revised Statutes, the word "suffers," as distinguished from "procures," as giving a ground of action to the assignee, must be held to be eliminated also from section 5128 of the Revised Statutes, it not having been in section 35 of the act of 1867. This is necessary because of the common purpose and character of the two provisions, as defined in *Wilson* v. *City Bank;* and because, otherwise, the enactment of section 5128 would be allowed, contrary to section 5601, to affect the provisions of section 12 of the amendatory bankruptcy act of June 22, 1874; and because, otherwise, that act, if passed *before* the Revised Statutes, would not have as full effect as if passed *after;* and because, otherwise, as the provisions of said section 12 thus vary from, and are in conflict with, such provision in section 5128, they could not have effect as a subsequent statute, and as repealing said part of section 5128, which is inconsistent with said provisions of said section 12. If the amendatory bankruptcy act of June 22, 1874, was passed *after* the Revised Statutes, the word "suffers" must, necessarily, be stricken out from section 5128, because it is thereby stricken out from section 39 of the act of

1867, and from section 5021. In either view, the word "suffer" disappeared entirely from the bankruptcy statute when the amendatory bankruptcy act of 1874 was enacted.

But aside from this, the only other view would be that, if the effect of section 12 of said act of 1874 is only to strike out the word "suffer" from section 39 of the act of 1867, and the word "suffers" from section 5021, leaving the word "suffers" in section 5128, although the word "suffer" was not in section 35 of the act of 1867, we have simply a reversal of the state of things commented on in *Wilson* v. *City Bank*. We have "procures" or "suffers," in section 5128, still in force—that section representing section 35 of the act of 1867; and we have only "procures" without "suffers" in section 5021—that section representing section 39 of the act of 1867, as amended by section 12 of the said act of 1874. In *Wilson* v. *City Bank* we had "procure or suffer" in said section 39, and we had "procures" alone, without "suffers," in said section 35. In this state of things the same ruling that was made in *Wilson* v. *City Bank* would apply to the transposed enactments, and the strong inference would be that the act of suffering the debtor's property to be attached or seized on execution, in section 5128, as representing said section 35, is precisely the same as *procuring* it to be taken on legal process, in said section 39, as so amended. So, in any event, practically, the word "suffer" is abolished and the word "procure" alone remains. Moreover, the history of the legislation and of the judicial decisions on it shows that the word "procure" cannot have attached to it any of the meaning which properly attached to the word "suffer," as distinguished from the word "procure." In *Wilson* v. *City Bank* it was said by the court that the act of suffering or the act of procuring, which are the same, must be accompanied by the intent specified in the statute; that in both there must be the positive purpose of doing an act forbidden by the statute, and the thing described must be done in the promotion of such unlawful purpose; that the facts of that case did not show any positive or affirmative act of the debtors from which such intent might be inferred; that through the whole of the legal proceedings against them they remained perfectly passive; that they owed a debt which they were unable to pay when it became due; that the creditor sued them and recovered judgment, and levied execution on their property; that they afforded him no facilities to do this, and they interposed no hindrance; that it cannot be inferred that a man intends, in the sense of desiring, promoting, or procuring it, a result of other persons' acts, when he contributes nothing to their

success or completion, and is under no legal or moral obligation to hinder or prevent them; that all the other modes of preferring creditors found in direct context in the statute are of a positive and affirmative character, and are evidences of an active desire or wish to prefer one creditor to others, and that a passive indifference and inaction, where no action is required by positive law or good morals, cannot be construed into such a preference as the law forbids.

The summary by the court of its conclusions was:

"(1) That something more than passive non-resistance of an insolvent debtor to regular judicial proceedings, in which a judgment and levy on his property are obtained when the debt is due and he is without just defence to the action, is necessary to show a preference of a creditor, or a purpose to defeat or delay the operation of the bankrupt act; (2) that the fact that the debtor, under such circumstances, does not file a petition in bankruptcy, is not sufficient evidence of such preference, or of intent to defeat the operation of the act; (3) that, though the judgment creditor in such case may know the insolvent condition of the debtor, his levy and seizure are not void, under the circumstances, nor any violation of the bankrupt law; (4) that a lien thus obtained by him will not be displaced by subsequent proceedings in bankruptcy against the debtor, though within four months of the filing of the petition."

In the present case the illegality of the levy is sought to be maintained on the ground of a distinction between the facts in this case and those in *Wilson* v. *City Bank.* It is contended that in this case evidence exists of a wish or design on the part of the debtors to give the creditor a preference, or oppose or delay the operation of the bankruptcy statute, and stress is laid upon these remarks of the court in *Wilson* v. *City Bank:*

"Undoubtedly, very slight evidence of an affirmative character of the existence of a desire to prefer one creditor, or of acts done with a view to secure such preference, might be sufficient to invalidate the whole transaction. Such evidence might be sufficient to leave the matter to a jury, or to support a decree, because the known existence of a motive to prefer or to defraud the bankrupt act would color acts or decisions otherwise of no significance. These cases must rest on their own circumstances. But the case before us is destitute of any evidence of the existence of such a motive, unless it is to be imputed as a conclusion of law from facts which we do not think raise such an implication."

In that case the debtors were insolvent when the suit was brought. The creditor had then reasonable cause to believe it, and knew that the debtors had committed an act of bankruptcy, and that they had no property but the stock of goods, which the creditor afterwards levied on. The debtors gave no notice to any of their creditors that the suit had been brought, and, having no defence to it, did not de-

fend it or go into voluntary bankruptcy, nor otherwise make any effort to prevent the judgment or the levy.

In order to see whether there is any legal distinction between the facts in that case and those in the present case it is important to see under what circumstances, in cases since *Wilson* v. *City Bank*, the supreme court has held cases of executions on judgment to be valid or invalid preferences.

In *Little* v. *Alexander*, 21 Wall. 500, the bankrupt gave a note to his son for an old debt and interest, and for a new sum then first loaned, the debtor then being known to be insolvent, under such circumstances that, under a recent statute, the creditor could obtain a judgment on the note at an earlier time than he could have obtained a judgment for the old debt without the note. It was held that the purpose of the transaction was to give the son a judgment before other creditors on old debts. It was contended that because the debtor had no defence, and made none, the case was within *Wilson* v. *City Bank*, but the court said :

"No careful reader of that case can fail to see that if the debtor there had done anything before suit which would have secured the bank a judgment with priority of lien, with intent to do so, the judgment of this court would have been different from what it was."

This implies that an overt act in aid of the judgment is necessary, and that the existence of a wish, unaccompanied by any such overt act, is not equivalent to the statutory intent.

In *Nat. Bank* v. *Warren*, 96 U. S. 539, it was contended for the creditor that the case was identical with *Wilson* v. *City Bank*, while the assignees in bankruptcy contended the contrary. The court said: "This action goes upon the theory that the mere non-resistance of a debtor to judicial proceedings against him when the debt is due, and there is no valid defence to it, is the suffering and giving a preference under the bankrupt act. This theory is expressly repudiated in the case of *Wilson* v. *City Bank*, 17 Wall. 473. It is also held in that case that the facts that the debtor does not himself file the petition in bankruptcy under such circumstances, and that the creditor was aware of the insolvency of the debtor, do not avoid the judgment and execution. In the present case there is not proven a single fact or circumstance tending to show a concurrence or aid on the part of the debtors in obtaining the judgment or securing the payment of the debt." The meaning of this is that there must be acts in concurrence or in aid—acts which promote or secure the judgment or the levy to a tangible degree or extent—which would not have ex-

isted but for such act, and that it is not enough to show merely a mental state of acquiescence or satisfaction or approval, in view of the prospect that the judgment and the levy will result in a preference. There must be enough to warrant the court in saying that the debtor did something towards procuring the preference, and did it with intent that there should be the preference. *London* v. *First Nat. Bank,* 15 N. B. R. 476, 483; *Will* v. *Hereth,* 13 N. B. R. 106; *In re Runyi,* 3 Fed. Rep. 790; *Darling* v. *Townsend,* 5 Fed. Rep. 176.

Five judgments in favor of the Jefferson County National Bank, amounting to $7,968.06, were recovered against the debtors on the sixth of April, 1877, and executions were issued and levied on the debtor's property on that day. Afterwards, on the same day, a petition in involuntary bankruptcy was filed against the debtors. The judgments were recovered in suits regularly commenced and prosecuted, as adversary suits, by summons and complaint, and the proceedings were, as to manner and time, all in accordance with the usual practice under the laws of New York. The summonses and complaints were served by the sheriff March 16, 1881, and the full time for the defendants to answer expired before the judgments were entered. The suits were brought on commercial paper, drawn, made, or indorsed by the bankrupts. It is conceded that the debtors were insolvent when the suits were commenced. The bill alleges that the suits were commenced "with the assent, connivance, and procurement" of the debtors, and that the debtors "did procure and suffer" their property to be seized on the executions with intent to give a preference to the bank, a creditor of them, and who had reasonable cause to believe them to be insolvent, and knew that a fraud on the bankruptcy act was intended. Under an order made by the district court in bankruptcy, the property levied on was sold, and the net proceeds, $9,351.50, were deposited, subject to the order of said court. The district court made a decree in this suit, decreeing the judgments and executions to be void as against the plaintiff, and that the $9,351.50 belongs to the plaintiff, and awarding to him his costs of this suit.

It is contended for the plaintiff that the bankrupts procured their property to be seized on the executions, and that they were not passive, but positive and active, in their efforts to procure and secure the preferences. Henry V. Cadwell, one of the debtors, testifies that he understood they could be put into bankruptcy 40 days after their paper had gone to protest, and that he desired the judgments to mature before a petition in bankruptcy should be filed against them.

The question is whether the debtors acted on such desire, and whether they did or said anything which efficiently contributed to the postponement of the filing of the petition in bankruptcy until after the judgments had ripened into executions. This could be done as well by delaying the bankruptcy proceedings until after the judgments had matured in the regular cause, as by speeding the entry of the judgments before their regular time. The debtors contemplated making a voluntary assignment of all their property for the benefit of their creditors, and H. V. Cadwell testifies that they intended to let the judgments mature, so that executions on them should be issued before such assignment should be executed. The other two debtors testify to the same effect. The voluntary assignment was made on the sixth of April, 1877, and was recorded in the county clerk's office one hour and three-quarters after the executions were levied, and one hour and a quarter after the petition in bankruptcy was filed. The judgments were entered at 8 o'clock A. M.; the executions were levied at 8½ o'clock A. M.; the petition in bankruptcy was filed at 9 o'clock A. M.; and the voluntary assignment was recorded at 10¼ A. M. The attorneys for the bank in the suits were McCartin & Williams. McCartin & Williams had been attorneys for the debtors for some years, and were consulted by them about their financial affairs and embarrassments after the suits were brought, and as to what was best to be done. McCartin & Williams also drew the voluntary assignments. There is no evidence that any suggestion to the bank that it ought to sue came from the debtors, or from McCartin & Williams. Nothing appears to have been done by McCartin & Williams, or by the debtors, to facilitate the suits or the entry of the judgments. Failing sooner to make a voluntary assignment was no facilitation of the judgments, as respected any rights of the assignee in bankruptcy, nor would it have been, even if the voluntary assignment had preceded the petition in bankruptcy. As it was, the petition in bankruptcy preceded the voluntary assignment. Failing to file a voluntary petition in bankruptcy was, legally, no facilitation of the judgments, and, notwithstanding the wish on the part of the debtors that the judgments should precede an involuntary petition in bankruptcy, the question still remains whether there were any things said or done by the debtors, or by McCartin & Williams, influencing the action or non-action of the creditors who ultimately filed the petition in bankruptcy, which hindered the filing of such petition until after the judgments were recovered.

The plaintiff, Mr. John G. Brown, whose firm was at the time a

creditor of the debtors, and Mr. Daniel N. Crouse, whose firm, also, was at the time a creditor of the debtors, had an interview with Henry V. Cadwell on the twenty-second of March, 1877, at the store of the debtors, and asked him for a statement of the affairs of the debtors. He declined to make one except in the presence of his attorneys, McCartin & Williams. Afterwards, in the presence of McCartin & Williams, he declined to make any statement except as to liabilities. The same persons, Mr. Brown and Mr. Crouse, with their attorney, had an interview with Henry V. Cadwell on the thirtieth of March, 1877, at the store of the debtors. One of them asked him if he had been sued, and he named three suits, saying that he had been sued for a small amount, but not naming the suits by the bank. He also declined to answer, except in the presence of McCartin & Williams, as to whether he had paid a certain note of $600 since he had stopped payment. Afterwards, in the presence of one of said attorneys, and on his advice to that effect, H. V. Cadwell declined to answer as to that matter. On the part of the plaintiff it is testified that in reply to an inquiry made of H. V. Cadwell, in the said interview of March 30th, as to whether the firm had been sued by any one but the three named, he said that they had not been sued by any one else; that in an interview on March 30th between Mr. Crouse and Mr. Brown and said attorneys, one of said attorneys said to Mr. Crouse that they should allow no judgments of any amount to be taken against the debtors; that one of said attorneys, when asked by Mr. Crouse, at said interview, whether any one had sued the debtors, inquired "if we wanted to put them into bankruptcy;" that the reply was, "I told him I did—if we could get any points we wished to file a petition;" that Mr. Crouse, at said interview, asked one or both of said attorneys if the debtors had been sued by other parties, and they denied knowing anything about it; and that H. V. Cadwell said to Mr. Crouse that he declined to answer any question except in the presence of McCartin & Williams.

H. V. Cadwell testifies that McCartin & Williams were his attorneys when Mr. Brown and Mr. Crouse came to see him; that he told them that his attorneys advised him not to talk with them about his matters; and that he advised and consulted with McCartin & Williams about the affairs of the debtors during the time between the two visits of Mr. Brown and Mr. Crouse. He does not deny being asked by Mr. Crouse if he had been sued, and admits that he told Mr. Crouse that he had been sued by so and so; but denies that he said "only" by so and so. He admits that at the first visit he re-

fused to give Mr. Brown any information whatever, and did not give Mr. Crouse any more than he could help; that his said attorneys had told him that the least he answered the better it would be for him; and that he did not tell Mr. Crouse or Mr. Brown that the bank had sued them. He says, "I kept that to myself."

Mr. Brown testifies that he and Mr. Crouse, both of whom resided at Utica, went from there to Watertown on the thirtieth of March for the purpose of getting information to put the debtors in bankruptcy; that while at Watertown at that time they got such information; and that they proceeded to put them into bankruptcy.

The petition in bankruptcy is brought by seven copartnership firms, composing a firm of which Mr. Crouse was a member, and a firm of which Mr. Brown was a member. The debt to Mr. Crouse's firm is set forth as one note maturing March 30th, and one maturing April 29th. The debt to Mr. Brown's firm is set forth as one note maturing March 18th, one April 11th, one April 15th, and one May 7th, and an open account for goods sold. The acts of bankruptcy alleged in the petition are the preferential payment by the debtors, on the twenty-second of March, to one Normander, of about $600, he being liable as indorser on a note of theirs, and the fraudulent stoppage of payment by the debtors on the twenty-second of March.

It is alleged in the petition that the debtors "decline to give your petitioners any statement of their affairs, or how they stand, or what they can pay, but refer your petitioners to their lawyers, Messrs. McCartin & Williams, who also decline to give your petitioners any statement of said alleged bankrupts' affairs;" and that the debtors "are trying in some way to make away with their property, either to secure their confidential debts, or in some other manner to defraud their creditors." The petition was verified by Mr. Crouse and Mr. Brown, and two other creditors, on the fourth of April, and by a fifth creditor on the fifth of April. No defence appears to have been made to the petition, as the adjudication was made on the return-day of the order to show cause.

These facts make out a case of the procuring, by the debtors, of the taking of the property on execution. The creditors obtained, on the thirtieth of March, the necessary information to put the debtors into bankruptcy. They inquired of H. V. Cadwell about a payment by the debtors of a note of theirs for $600, and were met by his refusal to answer; such refusal being distinctly advised by McCartin and Williams. Presumably this was with a view to a petition in bankruptcy, as such a payment of $600 is alleged as an act

of bankruptcy in the petition. The creditors were also misled by what amounted, substantially, to a declaration by H. V. Cadwell and by McCartin and Williams that the bank had not brought the suits in question, and by the declaration of McCartin and Williams that they, acting for the debtors, and in their interest, and with fairness towards the inquiring creditors, would allow no judgments of any amount to be taken against the debtors. McCartin & Williams were distinctly informed, on behalf of Mr. Brown and Mr. Crouse, that they desired the information they were seeking with a view to action in reference to putting the debtors into bankruptcy. H. V. Cadwell, acting and speaking for the debtors, misled Mr. Brown and Mr. Crouse by what he said on the question of the suits by the bank, and did so intentionally, to secure the consummation of his desire that the judgments should precede a petition in bankruptcy.

McCartin & Williams, occupying the double position of attorneys for the debtors and attorneys for the bank, and holding themselves out to Mr. Crouse and Mr. Brown solely as attorneys for the debtors, and not making known their position as attorneys who had brought the suits for the bank, allowed H. V. Cadwell to say, and themselves said, to Mr. Crouse and Mr. Brown what amounted, in substance, if it did not in words, to an affirmative statement that the suits which they had brought for the bank had not been brought. This amounted to affirmative action and procuracy by the debtors, and by McCartin & Williams acting for them and on their behalf, and also on behalf of the bank. The purpose was, and the effect was, to delay the execution of the announced intention to put the debtors into bankruptcy until the judgments should have matured. It must be presumed, under the circumstances, unless the contrary is shown, that if Mr. Brown or Mr. Crouse had been informed on March 30th of the suits by the bank, the petition in bankruptcy would have been filed during the six days which elapsed between March 30th and April 6th. As it was it was filed only half an hour after the levy. Mr. Brown testifies that they got the information on March 30th on which the petition was filed. Mr. Brown testifies that the debts proved against the bankrupts amount to $24,206.22. The creditors' petition shows that the debts set forth in it, to the seven creditors who bring it, amount to $8,152.19; that all of these debts were contracted before March 30th except one to Nill & Jess for $41.13, which was contracted March 31st; and that Nill & Jess were creditors to the amount of $983.47, in addition to the $41.13, for debts contracted before March 30th. Therefore, not only were the debts set forth in the petition

more than one-third of the $24,206.22, but such debts, less the $41.13, were more than one-third of the $24,206.22, less the $41.13; and the petitioning creditors were the same in number, excluding the $41.13, so that the petition would have been effective on the thirty-first of March, excluding the $41.13.

The proof shows that all which McCartin & Williams said to Mr. Crouse or Mr. Brown, in regard to the affairs of the debtors, was said as representing the debtors, and was authorized by them. Therefore, the debtors are bound not only by what H. V. Cadwell said, but by what McCartin & Williams said. What was so said is competent evidence to affect the bank on the question as to the procuring by the debtors. On that question the intent of the debtors, in connection with the fact as to what they said or did themselves or by their authorized agents, as an element in procuring their property to be seized, is the vital question, and the proof must necessarily be as to what the debtors said and did, showing intent and having the effect to bring about such procuring, aside from the other things made essential by the statute. Such proof is independent proof of the *status* and action of the debtors, aside from proof as to the *status* of the creditor in respect to reasonable cause to believe insolvency, and knowledge that the transaction was intended to be and would be preferential. It must be held that the necessary proof has been made as to the intent and procurement by the debtors, and by competent evidence.

In regard to the *status* of the bank, Mr. Camp, the president of the bank, in his testimony, says that he did not know before he sued the Cadwells that McCartin & Williams were their attorneys; that McCartin & Williams had previously had one suit for the bank, it having no regular attorney; that he brought the suits mainly on his own judgment of what was best, without any suggestions from any one as to suing, and took the notes sued to McCartin & Williams; that he sued them because they failed to pay the paper as it became due, but he had no reason to suppose they were not just as able to pay as ever before; that the suits comprised their entire liabilities to the bank, and the bank had never sued them in that way before; that they had been sued before by the bank on notes, and had taken up the notes when sued; that when he now sued, his confidence in their financial ability was less than before, because they had declined to pay paper which they had promised to pay, and had failed to meet their obligations as they matured in the bank, and their obligations in the bank were increasing, and that during the winter of 1877 H. V. Cadwell

told him that the firm was good for $5,000 over and above all its indebtedness, and he believed him.

The suits were commenced March 16th. The earliest indebtedness sued on in them became due as early as February 11th; $2,682.81 of it fell due in February; $4,833 of it fell due in March, $3,000 on the fifteenth of March. Under the statute, the question is as to the insolvency of the Cadwells when the property was taken on the executions, and as to what the bank had at that time reasonable cause to believe, and what it then knew,—not as to insolvency at an earlier time, or reasonable cause to believe, or knowledge at an earlier time. The debtors stopped payment before the first of April. The day the bank sued them, or the day before that, Mr. Camp informed H. V. Cadwell that the bank was going to sue them. There can be no doubts that the debtors were insolvent on the sixth of April, at 8 : 30 o'clock A. M., when the execution was levied. The total assets have turned out to be $2,296. Prior to the sixteenth of March they had failed, from want of means, to pay their business debts as they matured in the usual course of business. They were insolvent on the sixteenth of March. About the middle of February H. V. Cadwell commenced conversing with Mr. Camp about his affairs. The bank was a creditor of theirs. H. V. Cadwell tells the story thus:

"I wanted more money. I went into the bank one day. It was like this: I sent my deposit up by one of my help at the store. Mr. Woolworth, the cashier, was busy, and he left it. Pretty soon Mr. Camp sent word he wanted to see me, and I went up there. Mr. Camp threw out $1,100 in paper I wanted discounted. I called him one side and found in bank $1,500 in past-due paper, in addition to the $1,100 I had to place to credit, and which he had thrown out. I told him I could not get along without having that $1,100 discounted. He then wanted me to take up some of the past-due paper. I promised to give him a bond of indemnity. Had no security but my own indorsements. I then went home and looked my matters over. I thought the firm was worth $10,000, but when I came to look matters over I found I was not worth as much as I thought. After a time, at the same interview, they [the bank] put the $1,100 to my credit. He wanted a statement. I did not make a statement, but considered myself worth $5,000. After the conversation the past-due paper continued to accumulate, and I promised if he would give me an additional discount of about $3,000 I would take up the past-due paper and the $3,000 when it became due. I did take up the past-due paper, but did not take up the $3,000. He allowed me to waive protest on the note at my request. He would not renew it, and it lay past due."

Then the suits were brought. The $3,000 referred to is, undoubtedly, that which fell due March 15th, from notes of $750 each. They were made February 12th by the debtors, payable one month

after date, and were indorsed by four several persons. This shows what Mr. Camp knew on the twelfth of February. He does not contradict it. It shows that he, and, therefore, the bank, had abundantly reasonable cause to believe, on the sixth of April, that the Cadwells were insolvent.

H. V. Cadwell testifies as follows:

"McCartin & Williams had been our attorneys for some years; that is, for the firm. They had charge of our collections in all matters of any importance. They were our attorneys during our financial embarrassments during the spring of 1877. He advised and consulted with them in relation to our affairs during the whole time of our financial troubles. We counselled with them about our affairs before we were sued by the bank. We talked and conferred with them about our embarrassment before that time. We advised with them as to what was best to be done. About that time I talked with Mr. Williams in regard to bankruptcy, but whether it was before or after we were sued by the bank I would not state. One or both of the firm of McCartin & Williams advised bankruptcy."

Whether this conversation about bankruptcy was before or after March 16th, it was, necessarily, before April 6th. If McCartin & Williams believed that the Cadwells were subjects for bankruptcy, they knew they were insolvent, and that a seizure of their goods on judgment by the bank would be preferential, and a fraud on the statute. H. V. Cadwell testifies that during the time between the bringing of the bank's suits and the sixth of April, McCartin & Williams were in consultation with him about his matters and advised with him, and in the main he followed their advice; and does not remember that he took counsel anywhere else. He also testifies that after the bank's suits were brought he told McCartin & Williams that the debtors intended to let the judgments mature before the assignment should be made, so that a lien should first be got by execution, and that he so arranged it with McCartin & Williams. They appeared as attorneys for the Cadwells on the return-day of the order to show cause in the bankruptcy petition. All the evidence goes to show that McCartin & Williams, as representing the bank, were acting in concert with the debtors to secure the preference for the bank, and that, with the knowledge and assent of McCartin & Williams, the debtors, knowing that McCartin & Williams were attorneys for the bank, and were seeking such preference for the bank, acted wholly under the advice of McCartin & Williams, and took such course as would secure such preference, by abstaining from making an assignment, and by concealing from Mr. Crouse and Mr. Brown knowledge of the suits by the bank, and by refusing information,

when asked by them, on material matters, and by misleading them as to the bank's suits, and by thereby inducing them not to hasten the bankruptcy proceedings which they had announced they intended to institute. - Discussion of the law as to how far the bank is bound by the knowledge of McCartin & Williams, is rendered unnecessary by the recent decision in *Rogers* v. *Palmer*, 102 U. S. 263. In that case an attorney procured a judgment by default in favor of a client against a person of whose insolvency and intent to commit a fraud on the bankruptcy law he had knowledge, and it was held that that knowledge was imputable to the client. The rule laid down in that case is that where a creditor employs an attorney to collect a note the attorney becomes his agent, and the acts of the attorney, and his knowledge obtained in the course of the employment, become the acts and the knowledge of the principal; and that where the attorney and the debtor are aware of the insolvent condition of the latter, and are co-operating to have his property seized on execution before the bankruptcy law can be enforced, and with intent to defeat its operation on the debtor's property, there is a fraud on the bankrupt law where the debtor contributes actively to that end.

The evidence in this case shows such knowledge and co-operation by H. V. Cadwell and McCartin & Williams, with such intent, and an active contribution to the preferential end by the debtor and the attorneys. To say that the knowledge which came to McCartin & Williams came to them because they were attorneys for the debtors on a prior employment, does not help the case. They were none the less acting for the bank, and the facility they had, through their employment for the debtors, to do just what was done in this case to secure the preference, is no mitigation; otherwise, all that a creditor seeking a preference need do, is to employ the debtor's prior attorney. The assignee in bankruptcy is entitled to the benefit of the principle that the bank is chargeable with the knowledge of what McCartin & Williams acquired a knowledge of while their employment by the bank was in force, no matter how such knowledge is acquired, and with their acts in pursuance of knowledge so acquired. It cannot vary this principle that the bank may not have known until after the levies that McCartin & Williams were attorney for the debtors. The principal is chargeable with the knowledge of the agent, even though ignorant of the peculiar facilities possessed by the agent for acquiring such knowledge. The natural knowledge of McCartin & Williams as to the insolvency of the Cadwells, and as to their design to prefer the bank, and as to the measures taken which

secured such preference, was acquired by McCartin & Williams after the suits by the bank were brought.

It is contended for the bank that to give a decree against it in this case requires a violation of the salutary and well-settled principle that communications made to an attorney in the course of any personal employment relating to the subject thereof, and which may be supposed to be drawn out in consequence of the relation in which the party making the communications and the attorney stand to each other, are under the seal of confidence, and entitled to protection as privileged communications. *Williams* v. *Fitch,* 18 N. Y. 547, 551; *Bacon* v. *Frisbie,* 80 N. Y. 394, 399. The argument is that McCartin & Williams were not at liberty to disclose to the bank what they learned from H. V. Cadwell, under their employment by the Cadwells after the suits were brought, and that, therefore, the bank is not chargeable with notice of what McCartin & Williams so learned. But the principle which protects such communications from disclosure only applies to giving them in evidence without the assent of the person making them. With such assent they may be given in evidence, as well against such person as against a third party. Here, there is no attempt to give in evidence by either McCartin or Williams, as a witness, any communications made to them by H. V. Cadwell. H. V. Cadwell himself has given all the evidence that has been given in regard to any communications by him to McCartin & Williams.

Really, there is no question involved as to any confidential communications by H. V. Caldwell to McCartin & Williams as attorneys for the debtors. The case is one where the attorneys for the creditor, after their employment by the creditor and the bringing of the suits, bound by their obligations to the creditor to secure his money for him by all proper means, entered into the service of the debtors, and by concert with them, and with their full knowledge, caused them to so act, and so acted themselves, in view of information obtained from and on behalf of the creditor from the debtor, who knew that the information was being given and received for the benefit of the creditor, as that the priority in time of the judgments to the bankruptcy proceedings, which was the vital point, was secured. The creditor cannot enjoy the benefit of the priority without taking it *cum onere,* accompanied by responsibility for the knowledge which the attorneys acquired in its service, and which enabled the attorneys to so guide the conduct of the debtors and of themselves as to secure priority.

On the record and by stipulation the defendant appears to have
v.9,no.5—18

made sundry objections to testimony in the district court. There was no disposition of them by any order of that court, or by any provision in the decree of that court. The petition of appeal sets forth that the decree below is erroneous because the district court committed errors in its rulings as to the admission of evidence reported by the examiner, and in declining to strike out such as were by defendant objected to, as will more fully appear by the objections to and requests to strike out evidence taken and filed with and before said judge on the hearing of the cause, some of which are referred to in his decision, and also in the rulings and decision of the said judge; that the defendant is chargeable with all the knowledge its attorneys in the prosecution of said several suits to judgment possessed, which was acquired in the progress of the suits, or present to their minds, if acquired previously; and also in holding that said attorneys were under no professional obligation not to disclose the circumstances and designs of the bankrupts, who became clients of theirs after the commencement of said suits, who desired to assist defendant, and that the presumption is they did communicate their information; and also in holding the declarations of the attorneys competent evidence of the intent and knowledge, and to charge defendant. The district judge rendered a decision, on which he said: "The attorneys employed to bring actions and obtain judgments were the bankrupts' attorneys, and the defendant is chargeable with all the knowledge they possessed which was acquired by them in the progress of the suits or present to their minds if acquired previously. Story, Ag. § 40; *The Distilled Spirits*, 11 Wall. 356. They were under no professional obligations not to disclose the circumstances and designs of clients who desired to assist the defendant, and the law presumes that they did communicate their information."

The defendant insists that several objections to evidence should be sustained and the evidence excluded. It was essential to prove the intent on the part of the bankrupts. Their declarations, while this intent was being effectuated, are as competent as their acts. So, also, the declarations of the attorneys, during the progress of the transaction, are evidence of their intent and knowledge. The advice given by the attorneys to their clients is excluded, because inadmissible under the rule which forbids the disclosure of confidential communications. The objections to and requests to strike out evidence referred to in the petition of appeal, as taken and filed with and before the district judge on the hearing of the cause, do not appear in the printed record from the district court, unless the

reference is intended to be to such objections in respect to evidence as are noted in the course of the taking of evidence. ·But many objections are insisted on by the defendant which do not appear in the record, being taken under a stipulation entered in the record "that all the evidence be taken, reserving the right to object, save as to form of question to any or all of the same, upon the hearing of the cause, with like effect as if the specific objections had been stated and noted by the examiner at the time the evidence was offered." The evidence of H. V. Cadwell, direct and cross, taken in bankruptcy, was admitted by stipulation; the stipulation as to the direct, or that for the plaintiff, being that objections to each and every part of it are reserved "until the hearing of the cause by consent of the respective counsel," and the stipulation as to the cross, or that for the defendant, being that all objections are "reserved until the hearing of the cause, save as to form of question."

I am furnished with a copy of the printed brief presented by the counsel for the defendant to the district court, in which his objections in respect to the evidence are set forth and numbered. Those objections are now insisted on by the defendant. It is not clear how far they can be considered on appeal, there being no disposition made of them by the district court by any order or decree. But the plaintiff's counsel, in his brief in this court, refers to the objections to evidence taken by the defendant as if they were properly before this court, and therefore I proceed to dispose of them by their numbers; and a provision may be inserted in the decree disposing of them. It is not entirely clear what the district court would, in an order, have excluded as being "advice given by the attorneys to their clients." Whatever any such order excluded would not come up for review in an appeal by the defendant. As it is, I shall dispose of the objections on the theory that none of them were allowed by the district court, as there is no order allowing any of them.

(1) Evidence as to the assignment was competent, as part of the history of the case, and throwing light on the intent of the debtors in respect to the judgments of the bank and on the question of the insolvency of the debtors.

(2) Evidence that McCartin & Williams drew the assignment was competent, as showing their knowledge of the insolvency of the debtors.

(3) Evidence that McCartin & Williams appeared for the debtors on the first of May, in the bankruptcy proceedings, was competent, as throwing light on their previous action in thwarting, in co-operation with the debtors, all other creditors but the bank.

(4) For the reasons before given I think the fact that McCartin & Williams, after the suits were brought, advised H. V. Cadwell to answer the

questions of Mr. Crouse and Mr. Brown only in the presence of said attorneys, was competent, H. V. Cadwell assenting to the disclosure, and the fact showing the co-operation of the attorneys representing the bank and of the debtors in securing the preference.

(5) The fact that McCartin & Williams had become attorneys for the debtors at the time of the visits of Mr. Brown and Mr. Crouse was competent, for the reasons before given.

(6) The fact that H. V. Cadwell told Mr. Brown and Mr. Crouse that McCartin & Williams advised him not to talk about his matters with Mr. Brown and Mr. Crouse is competent, for the reasons stated as to objection 4.

(7) Evidence as to the desire of H. V. Cadwell respecting the Van Schaick claim, and as to what Van Schaick told him, was incompetent.

(8) and (9) These objections are well taken.

(10) This objection is well taken.

(11) The evidence as to the inquiries made by Mr. Crouse of H. V. Cadwell and Cadwell's answer, and as to his refusal to make a statement respecting his affairs, was competent, as showing the intent of the debtors.

(12) and (13) The same ruling applies to Cadwell's statement as to whether he had been sued, and to his declining to answer as to his having paid the $600 note, and to his declining again when Mr. Williams advised him not to answer.

(14) Evidence as to what McCartin said about not allowing any judgments of any amount to be taken against the Cadwells, and as to the conversation with Williams about bankruptcy, and as to what the attorneys said about suits against the Cadwells, was competent, for the reasons before stated. If it was desired to inquire what the attorneys said in denying knowledge of any suits, that could, and should, have been asked on cross-examination.

(15) Mr. Crouse's testimony as to what Cadwell said about being advised by the attorneys to answer only in their presence, was incompetent to prove the fact of such advice being hearsay. The fact that Cadwell declined to answer except in their presence was competent.

(16) and (17) The testimony as to what Williams said at Utica, after the adjudication, about a compromise, was incompetent; and so was the other testimony as to an offer of compromise.

(18) and (19) This testimony ought to be excluded.

(20) and (21) This evidence was competent. The books could have been called for by the defendant, if desired.

(22) This evidence was competent.

(23) Evidence as to what Cadwell saw was competent, for the reasons stated in respect to objection 11.

(24) This evidence was competent, being of the same character as that covered by objection 14.

(25) So much of this evidence as states the understanding of the witness is incompetent. What was said would have been competent. The rest of the answer was unobjectionable.

(26) This evidence, at folio 345, was incompetent. That at folio 306 was competent.

The decree of the district court is affirmed, with costs.